UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

NATHAN LEAR,                )
                            )
            Plaintiff,      )
                            )  Case No. 2:17-cv-64
        v.                  )
                            )
NANCY A. BERRYHILL,         )
Acting Commissioner of Social Security, )
                            )
            Defendant.      )

**OPINION AND ORDER**

This matter is before the court on petition for judicial review of the decision of the Commissioner filed by the plaintiff, Nathan Lear, on February 10, 2017. For the following reasons, the decision of the Commissioner is **REMANDED**.

*Background*

The plaintiff, Nathan Lear, filed an application for Disability Insurance Benefits on January 5, 2011, alleging a disability onset date of April 5, 2005. (Tr. 22). The Disability Determination Bureau denied Lear's application and again on reconsideration. (Tr. 33). After a hearing, Administrative Law Judge (ALJ) Edward P. Studzinski issued an unfavorable decision on August 16, 2012. (Tr. 33). The Appeals Council denied review on November 13, 2013, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-5). Lear filed a complaint in the United States District Court on September 2, 2014. (Tr. 477). On March 24, 2016, District Judge Philip Simon remanded the ALJ's decision. (Tr. 513-25). Pursuant to the District Court's order, the Appeals Council vacated the previous decision and directed further proceedings consistent with the District Court's order. (Tr. 406). Lear filed a claim for Supplemental Security Income on January 7, 2015. The Appeals Counsel rendered the SSI claim

duplicative and directed the ALJ to consolidate the claim files. The ALJ held a hearing on October 26, 2016, and issued an unfavorable decision on November 25, 2016. (Tr. 369-94). Impartial Vocational Expert (VE) Julie Bose appeared at the hearing.

The ALJ found that Lear met the insured status requirements of the Social Security Act through June 30, 2007. (Tr. 371). At step one of the five step sequential analysis for determining whether an individual is disabled, the ALJ found that Lear had not engaged in substantial gainful activity since his alleged onset date of April 1, 2005. (Tr. 371). At step two, the ALJ determined that Lear had the following severe impairments: organic mental disorder secondary to traumatic brain injury and neuropathy, lower extremity. (Tr. 372).

At step three, the ALJ concluded that Lear did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 372). Specifically, the ALJ found that Lear did not meet Listing 11.14, Peripheral Neuropathy, because the medical evidence showed generally that Lear had no problems walking, maintaining his balance, rising from a seated position, or using his upper extremities. (Tr. 373). Based on the medical evidence, the ALJ found that the severity of the neuropathic disorder affecting his lower extremities did not meet or medically equal the listing criteria. (Tr. 373). The ALJ also concluded that Lear failed to meet Listing 11.18, Traumatic Brain Injury, as the evidence did not show that he had marked limitation in his ability to understand, remember, or apply information; interact with others; concentrate, persist, maintain pace, or adapt; or manage himself. (Tr. 373-74).

The ALJ determined that Lear failed to meet Listing 12.02, Organic Mental Disorders, because he did not satisfy the paragraph B criteria, which required a marked limitation in at least two of the following:

2

> restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace;

or a marked limitation in one of the following:

> restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration.

(Tr. 378). The ALJ defined a marked limitation as more than moderate but less than extreme and repeated episodes of decompensation, each of extended duration, as three episodes within one year or once every four months with each episode lasting at least two weeks. (Tr. 378).

The ALJ determined that Lear had moderate restrictions in daily living activities. (Tr. 378). The ALJ noted that with reminders and guidance from his case manager, Lear was capable of completing activities of daily living. (Tr. 379). The most recent Function Report indicated that he could clean, do laundry, and go shopping. (Tr. 379). However, the ALJ noted that daily activities took Lear extra time because of his decreased motor skills. (Tr. 379). Further, the ALJ noted that the case manager documented repeatedly that she reminded Lear to reduce the clutter in his home. (Tr. 379).

Next, the ALJ found that Lear had moderate difficulties in social functioning. (Tr. 379). Lear reported that he had lost a job because he argued with his supervisor and cursed at a coworker. (Tr. 379). He sought treatment from a therapist because he was frustrated easily and had difficulty controlling his anger. (Tr. 379). However, the ALJ found that there was no evidence that he responded to his frustrations with verbal or physical aggression. (Tr. 379). Lear's employer stated that Lear had trouble accepting criticism and debated with him frequently. (Tr. 379). However, the ALJ found that there was no evidence that this debate took the form of verbal aggression. (Tr. 379). The ALJ noted that Lear had trouble meeting new

3

people, especially women. (Tr. 379). Lear reported that his last relationship ended in August 2015 and that he obsessed over the relationship ending until February 2016. (Tr. 379).

The ALJ concluded that Lear had marked difficulties in concentration, persistence, or pace. (Tr. 379). Lear alleged that he struggled with concentration and that he had memory loss. (Tr. 379). In February 2011, he underwent a psychological consultative evaluation. (Tr. 379). The evaluating psychologist found that his memory function was below average. (Tr. 379). A second evaluation by a treating psychiatrist in December 2015 found that Lear did well in terms of attention, registration, concentration, and short term memory. (Tr. 379-80). The ALJ noted that in the time between the two evaluations, Lear had stopped drinking alcohol and smoking marijuana. (Tr. 380). Lear reported that he had difficulty processing information in social situations. (Tr. 380). Further, the ALJ noted that Lear's ability to sustain his concentration was affected by stress. (Tr. 380). Also, the ALJ indicated that occasionally Lear's leg pain could cause his mind to wander while performing tasks. (Tr. 380).

The ALJ found that Lear had not experienced any episodes of decompensation which were of extended duration. (Tr. 380). Lear alleged that he had a history of suicidal ideation and that he had attempted suicide. (Tr. 380). However, he did not receive mental health treatment until October 2012, and he stated to his treating psychiatrist that he had not felt suicidal since he was 24. (Tr. 380). Because Lear did not have two marked limitations or one marked limitation and repeated episodes of decompensation, the ALJ determined that he did not satisfy the paragraph B criteria. (Tr. 380).

Additionally, the ALJ found that Lear did not satisfy the paragraph C criteria. (Tr. 381). The ALJ determined that there was no evidence that Lear had experienced any episodes of decompensation. (Tr. 381). Moreover, the ALJ determined that the evidence did not suggest

4

that Lear would decompensate if subjected to even a minimal increase on mental demands or change in environment. (Tr. 381). The ALJ acknowledged that Lear received skill training both in and out of his home from a case manager. (Tr. 381). However, he found that there was no evidence to suggest that Lear required a highly supportive living arrangement or that he was incapable of working on his own. (Tr. 381).

The ALJ then assessed Lear's residual functional capacity (RFC) as follows:

> the claimant has the residual functional capacity to lift and/or carry up to 20 pounds occasionally and 10 pounds frequently, and has no limitations in the total amount of time he is able to sit throughout an 8-hour workday. He can walk 1 mile at a time, and can stand or walk for a total of 6 hours out of an 8-hour workday. The claimant needs to alternate his position between sitting, standing, and walking for no more than five minutes out of every half hour. While doing so, he would not need to be off task. He is unable to perform prolonged ambulation on wet, slippery, or uneven terrain. The claimant can occasionally climb ramps and stairs, and he can occasionally stoop, kneel, balance, crouch, and crawl, but he can never climb ladders, ropes, or scaffolds. The claimant is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working at unprotected heights, or around exposed flames or unguarded large bodies of water. He should avoid concentrated exposure to unguarded hazardous machinery. He is incapable of work requiring rapid or complex verbal communication. The claimant is further limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. He can work at an average production pace, but not at an above average pace. He ought not to be required to exercise motivation with respect to work tasks, but should have work presented to him at his workstation at an average production pace. His work should involve less variety of tasks than in his current dishwasher janitorial position. He is further precluded from work involving direct public service, in person or over the phone, although the claimant can tolerate brief and superficial interaction with the public that is incidental to his primary job duties. He is unable to work in crowded, hectic environments. The claimant can tolerate brief and superficial interaction with supervisors and co-workers, but is not to engage in tandem tasks.

(Tr. 381-82). The ALJ explained that in considering Lear's symptoms he followed a two-step process. (Tr. 382). First, he determined whether there was an underlying medically

5

determinable physical or mental impairment that was shown by a medically acceptable clinical and laboratory diagnostic technique that reasonably could be expected to produce Lear's pain or other symptoms. (Tr. 382). Then, he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Lear's functioning. (Tr. 382).

The ALJ found that Lear's statements concerning the intensity, persistence, and limiting effects of his symptoms were not consistent with medical evidence and other evidence in the record. (Tr. 383). The ALJ found that while Lear experienced symptoms and limitations due to his physical and mental impairments, his testimony and allegations regarding those limitations were disproportionate to the objective findings within the record. (Tr. 383). The ALJ found that the record did not establish that Lear's limitations were severe enough to preclude him from working all together. (Tr. 383).

Lear has alleged that he was disabled beginning April 1, 2005. (Tr. 383). He testified that he was hit by a car, and thereafter underwent physical, occupational, and speech therapy. (Tr. 382). He has indicated that he never has completely recovered. (Tr. 382). However, the ALJ found that there was no evidence showing any medically determinable mental or physical impairments prior to 2013. (Tr. 383). The ALJ found that while Lear did have leg pain, his pain management was under control with the use of medication. (Tr. 384). Further, while he had limited use of his lower extremities immediately following the accident, he improved and the record showed normal muscle strength, tone, reflexes, and sensation responses in all of his extremities. (Tr. 384). Lear's treating neurologist described his gait as ataxic, but the ALJ found that the record did not show that he had any issues walking. (Tr. 384). In fact, the ALJ noted that Lear enjoyed nature walks and that he worked side jobs in landscaping and cutting lawns in May 2016. (Tr. 384).

6

Next, Lear testified that the tremor in his left hand made daily activities difficult. (Tr. 384). However, the physician who conducted the internal medicine consultative examination did not document a tremor and noted that Lear had normal grip strength with no difficulty performing fine or gross manipulations. (Tr. 384).

Regarding Lear's memory issues, the ALJ found that while he needed reminders to stay on task there was no evidence that he could not complete the tasks that were given to him. (Tr. 384). Lear testified that a case manager checked on him at least once every two weeks to remind him to pay bills and to complete chores. (Tr. 384). However, the ALJ noted that there was no evidence that the case manager monitored Lear's ability to complete the chores or managed his finances closely. (Tr. 384). Further, the ALJ noted Lear's ability to drive and found that driving required an individual to multitask. (Tr. 385).

In the prior decision, the ALJ assigned no weight to the opinion of physician Mutena Korman, M.D., who conducted Lear's internal medicine consultative examination. (Tr. 387). Dr. Korman found that Lear's cognitive functioning prevented him from working in a "normal working environment." (Tr. 387). The ALJ rejected this opinion because Dr. Korman was a primary care physician and there was no evidence that he had performed cognitive testing on Lear. (Tr. 387). However, Judge Simon rejected this reasoning and found that Dr. Korman would have received training in cognitive functioning and was fully capable of diagnosing and treating mental dysfunction. (Tr. 387).

The ALJ has concluded that Dr. Korman did not provide a reasonable explanation based on the medical evidence to support his opinion. (Tr. 387). The ALJ noted that Judge Simon determined that the GAF score of 45 provided to Lear by psychologist John Heroldt, Ed. D., was sufficient to support Dr. Korman's opinion. (Tr. 387). However, the ALJ has disagreed, finding

7

that a single GAF score provided by a psychologist after one examination was not enough to support a family practitioner's opinion of cognitive function. (Tr. 388). The ALJ stated that GAF scores were subjective and that a trend of scores was needed to get an accurate picture of one's abilities. (Tr. 388).

Judge Simon determined that the ALJ did not establish a logical bridge between the psychological evaluation's findings and the ALJ's determination that those findings were "relatively normal." (Tr. 388). The ALJ agreed. (Tr. 388). Therefore, in readdressing the issue the ALJ noted that Dr. Heroldt did not specifically state that Lear was unable to work because of his below average cognitive capacity. (Tr. 388). Moreover, the ALJ has claimed that the single GAF score given by Dr. Heroldt, without access to medical evidence, did not show Lear's ability to function beyond the moment he received the score. (Tr. 388-89).

Judge Simon concluded that Lear's testimony that he received "significant accommodations" was ignored by the ALJ. (Tr. 389). However, the ALJ determined that extra time on a test or to finish an assignment was not a significant accommodation, but rather a reasonable accommodation. (Tr. 389). The ALJ noted that Lear did not receive special education services nor did he have an Individualized Education Program (IEP) plan, and therefore he did not receive significant accommodations. (Tr. 389).

The ALJ rejected Dr. Korman's opinion based on Lear's work history. (Tr. 389). Judge Simon concluded that the ALJ's finding that Lear could not perform his last job supported Dr. Korman's opinion that he was unable to perform in a normal working environment. (Tr. 389). However, the ALJ has indicated that Lear could not perform his last job because the exertional level required exceeded the exertional level provided in the RFC assessment. (Tr. 389). The

8

ALJ further noted that Dr. Korman was basing his opinion on Lear's lowered cognitive function. (Tr. 389).

Moreover, the ALJ has indicated that Dr. Korman and Dr. Heroldt were unaware of Lear's substance abuse. (Tr. 389). Therefore, the ALJ has indicated that Lear's abuse of alcohol and marijuana reasonably could have effected Lear's cognitive functioning at the time of his examination by Dr. Korman. (Tr. 389). The ALJ has claimed that the findings of the mental status examination in December 2015 indicated that Lear showed improvement in his cognitive function after he stopped using alcohol and marijuana. (Tr. 389).

At step four, the ALJ found that Lear had no past relevant work. (Tr. 392). Considering Lear's age, education, work experience, and RFC, the ALJ concluded that there were jobs in the national economy that he could perform, including cleaner and polisher (23,900 jobs nationally), laundry folder (95,300 jobs nationally), and labeler (21,900 jobs nationally). (Tr. 393).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Moore v. Colvin***, 743 F.3d 1118, 1120–21 (7th Cir. 2014); ***Bates v. Colvin***, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence."); ***Pepper v. Colvin***, 712 F.3d 351, 361–62 (7th Cir. 2013); ***Schmidt v. Barnhart***, 395 F.3d 737, 744 (7th Cir. 2005); ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a

conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting ***Consol. Edison Co. v. NLRB***, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see* ***Bates***, 736 F.3d at 1098; ***Pepper***, 712 F.3d at 361–62; ***Jens v. Barnhart***, 347 F.3d 209, 212 (7th Cir. 2003); ***Sims v. Barnhart***, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. ***Roddy v. Astrue***, 705 F.3d 631, 636 (7th Cir. 2013); ***Rice v. Barnhart***, 384 F.3d 363, 368–69 (7th Cir. 2004); ***Scott v. Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez***, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. §§ 404.1520, 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. §§ 404.1520(b), 416.920(b)**. If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 416.920(c)**; *see* ***Williams v. Colvin***, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's

10

impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e)**. However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f)**.

Lear has argued that the ALJ failed to account for his marked difficulties in concentration, persistence, or pace in his mental RFC assessment. SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in his written decision. "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Although the ALJ does not need to discuss every piece of evidence, he cannot ignore evidence that undermines his ultimate conclusions. *Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support his conclusion and explain why that evidence was rejected.") (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). "A decision that lacks adequate discussion of the issues will be remanded." *Moore*, 743 F.3d at 1121.

Lear has argued that the ALJ erred in finding that he could perform simple, routine tasks at an average pace despite his marked difficulties in concentration, persistence, or pace. Lear has indicated that the ALJ failed to account for his slowed motor skills and his inability to complete serial sevens examination. Further, Lear asserts that the record contained evidence that he was told by others previously that he operated at too slow of a pace. Moreover, he had difficulty completing tasks before becoming sidetracked or overwhelmed. The ALJ must confront the evidence that does not support his conclusion and explain why that evidence was rejected. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)

The Commissioner contends that the ALJ properly supported and addressed Lear's deficiencies in concentration, persistence, or pace. The RFC indicated that Lear is "limited to simple, routine tasks, work involving no more than simple decision-making, no more than

occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. He can work at an average production pace, but not at an above average pace." (Tr. 382). The Commissioner has argued that limiting Lear to "average production pace" sufficiently accounts for Lear's marked limitation in concentration, persistence, or pace.

The Seventh Circuit has rejected the notion that confining a claimant to simple, routine tasks adequately captures the limitations of one who has deficiencies in concentration, persistence, or pace. *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014). Whether simple, routine tasks can be learned is "unrelated to the question of whether an individual with mental impairments – *e.g.*, with difficulties maintaining concentration, persistence, or pace – can perform such work." *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015). "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). In this matter, the ALJ determined that Lear had marked restrictions, which were more severe than moderate restrictions. **20 C.F.R. § 404.1520a(c)(4).** The RFC indicated that Lear could work at an "average production pace," however the ALJ failed to define "average production pace." The Seventh Circuit has held that limiting a claimant to "no fast paced production requirements," does not adequately define the limitations for someone with a moderate limitation in concentration, persistence, or pace. *Varga*, 794 F.3d at 815. Moreover, the Seventh Circuit held that such a term must be defined, or else it would be "impossible … to assess whether a person with [the claimant's] limitations could maintain the pace proposed." *Varga,* 794 F.3d at 815.

In failing to provide a definition for "average production pace," the ALJ limited Lear to "simple, routine tasks" for an undetermined sustained period, which the Seventh Circuit has held does not adequately account for a moderate limitation in maintaining concentration, persistence,

13

or pace. *See* **Bainter v. Colvin,** 2015 WL 5177754, at *11 (N.D. Ill. 2015) (the ALJ failed to define "average production standards"); **Buitron v. Colvin**, No. 2:14-CV-445-PRC, 2016 WL 1056053, at *14 (N.D. Ind. Mar. 17, 2016); **O'Connor-Spinner**, 627 F.3d at 620. The Commissioner's argument that the limitations to simple, routine work and to no more than average production requirements adequately capture moderate limitations in concentration, persistence and pace are contrary to binding precedent. **Ingle v. Colvin,** 2016 WL 270006, at *9 (S.D. Ill. 2016).

Lear also has argued that the ALJ created an evidentiary deficit for which he had no medical opinion to base his RFC assessment. Lear has argued that once the ALJ determined that none of the available medical evidence accurately accounted for his functional restrictions, he was not permitted to offer his lay interpretation of the objective medical evidence. Since the court has found that the ALJ did not properly account for Lear's marked limitations in concentration, persistence, or pace, the ALJ should consider and weigh all of the relevant evidence in formulating Lear's RFC.

Next, Lear has argued that the ALJ erred in evaluating the opinion of examining physician, Dr. Mutenta Korman, M.D. Lear contends that the ALJ did not follow the District Court's remand order. Generally, an ALJ affords more weight to the opinion of an examining source than the opinion of a non-examining source, but the ultimate weight given depends on the opinion's consistency with the objective medical evidence, the quality of the explanation, and the source's specialty. **Givens v. Colvin**, 551 F. App'x 855, 860 (7th Cir. 2013); **20 C.F.R. § 404.1527(c)**. "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." **Gudgel v. Barnhart**, 345 F.3d 467, 470 (7th Cir. 2003). An ALJ may

give less weight to an examining source's opinion when it appears to rely heavily on the claimant's subjective complaints. *Givens*, 551 F. App'x at 861; *see* **20 C.F.R. § 404.1527(c)(3)** ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give the opinion. The better explanation a source provides for an opinion the more weight we will give that opinion."); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Dr. Korman determined that Lear's cognitive functioning prevented him from working in a "normal working environment." (Tr. 387). The ALJ has indicated that Dr. Korman's opinion was not supported by a reasonable explanation that was based on medical evidence. (Tr. 387). The ALJ asserts that after reviewing the exhibits he determined that they did not support Dr. Korman's opinion. (Tr. 387). However, Judge Simon in his remand order indicated that Dr. Korman's opinion *was in fact* corroborated by Dr. Heroldt's low GAF score. *Lear v. Berryhill*, No. 2:14-CV-00307, 2016 WL 1165682 at *4.

The ALJ pointed out that GAF scores were removed from the fifth edition of *Diagnostic and Statistical Manual of Mental Health Disorder*, as the American Psychiatric Association concluded that a single GAF score contains information that is likely to vary from time to time. (Tr. 387-388). Therefore, the ALJ has indicated that a single GAF score may not accurately depict one's functioning level. (Tr. 388-389). Moreover, the ALJ represented that treating psychiatrist, Paul Dobransky, M.D., gave Lear GAF scores of 60 three separate times over six months of treatment. (Tr. 391). The ALJ contended that the consistency of GAF scores over the course of six months deserves more weight than a single score given by an examining physician. (Tr. 391).

In the ALJ's decision, he indicated that after reviewing the exhibits he determined that they did not support Dr. Korman's opinion. (Tr. 387). An ALJ cannot play the role of doctor and interpret medical evidence when he is not qualified to do so. **Rohan v. Chater,** 98 F.3d 966, 970 (7th Cir. 1996); **Schmidt v. Sullivan,** 914 F.2d 117, 118 (7th Cir. 1990). Moreover, when an ALJ has rejected or even discounted an examining SSA doctor's opinion, he must provide a good explanation for doing so. **Beardsley**, 758 F.3d at 839. The ALJ has not pointed to any medical evidence to support his contention, and therefore has failed to establish the logical bridge necessary for meaningful review of the decision.

Lear has argued that the ALJ failed to comply with Judge Simon's remand order. In the prior decision, the ALJ did not account for Lear's testimony that he needed significant accommodations to graduate from high school when considering Dr. Korman's medical opinion. Judge Simon indicated that to build a logical bridge the ALJ should have at least mentioned Lear's claim that he received extra time on tests or assignments. **Lear v. Berryhill**, No. 2:14-CV-00307, 2016 WL 1165682 at *4. The ALJ concluded that extra time on tests or to finish assignments was not significant accommodation, rather the ALJ determined it was a reasonable accommodation. (Tr. 389). Additionally, the ALJ noted that Lear graduated from high school without special education services or an Individualized Education Program (IEP). (Tr. 389).

It is unclear from the ALJ's decision if the ALJ considered Lear's accommodation, whether reasonable or significant, in weighing Dr. Korman's opinion. The ALJ cannot cherry pick the evidence that is favorable to a finding of nondisability. **Golembiewski v. Barnhart**, 322 F.3d 912, 918 (7th Cir. 2003). The ALJ should have at least considered Lear's accommodation, regardless if it was reasonable or significant, in weighing Dr. Korman's opinion that Lear could not perform in a normal work environment.

Next, Lear has argued that the ALJ erred in evaluating his subjective allegations that addressed the intensity, persistence, and limiting effects of his pain and symptoms. An ALJ's evaluation of subjective symptoms will be upheld unless it is patently wrong. ***Shideler v. Astrue***, 688 F.3d 306, 310-11 (7th Cir. 2012). Nevertheless, an ALJ must support his evaluation with specific reasons that are supported by the record. ***Pepper v. Colvin***, 712 F.3d 351, 367 (7th Cir. 2013). The SSA has issued new guidance on how the agency assesses the effects of a claimant's alleged symptoms. On March 28, 2016, Social Security Ruling 16-3p became effective and issued new guidance regarding the evaluation of a disability claimant's statements about the intensity, persistence, and limiting effects of symptoms. *See* **SSR 16-3p,** 2016 WL 1237954 (Mar. 28, 2016). Under SSR 16-3p, an ALJ must assess the claimant's subjective symptoms rather than assessing his "credibility." The Social Security Administration clarified that Social Security Ruling 16-3p only applies when the ALJ's "make determinations and decisions on or after March 28, 2016" and that Social Security Ruling 96-7p governs cases decided before that date. *See* Notices, Social Security Ruling 16-3p, 2017 WL 4790249 (Oct. 25, 2017). The ALJ issued his decision in this matter on November 25, 2016. Therefore, the Commissioner's contention that SSR 96-7p governs this case is misplaced.

Under SSR 16-3, the ALJ must first determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce his symptoms. **SSR 16-3p,** 2016 WL 1119029, at *2. Then, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." **SSR 16-3p,** 2016 WL 1119029, at *2. An individual's statements about the intensity and persistence of the pain may not be disregarded because they are not substantiated by objective medical evidence. **SSR 16-**

17

**3p,** 2016 WL 1119029 at *5. In determining the ability of the claimant to perform work-related activities, the ALJ must consider the entire case record, and the decision must contain specific reasons for the finding. **SSR 16-3p,** 2016 WL 1119029, at *4, 9.

Lear has argued that the ALJ over-relied on his activities of daily living in finding that his allegations that concerned the intensity, persistence, and limiting effects of his pain and symptoms were not entirely consistent with the medical evidence and other evidence in the record. To support a finding that the claimant can sustain employment, the claimant's daily activities must reflect that the person is capable of engaging in work eight hours a day for five consecutive days a week. **Carradine v. Barnhart**, 360 F.3d 751, 755 (7th Cir. 2004); *see* **Hughes v. Astrue**, 705 F.3d 276 (7th Cir. 2013); **Roddy v. Astrue**, 705 F.3d 631 (7th Cir. 2013). To show this, the record should reflect that the claimant engages in such activities for a substantial part of the day. **Carradine**, 360 F.3d at 756. "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as he would be by an employer." **Hughes**, 705 F.3d at 278 (quoting **Bjornson v. Astrue**, 671 F.3d 640, 647 (7th Cir. 2012)). The Seventh Circuit Court cautions, however that the claimant's "ability to struggle through the activities of daily living does not mean that he can manage the requirements of a modern workplace." **Punzio v. Astrue,** 630 F.3d 704, 712 (7th Cir. 2011)).

The ALJ indicated that Lear testified that a case manager checked on him at least once every two weeks to remind him to pay bills and to complete chores. (Tr. 384). However, the ALJ noted that there was no evidence that the case manager monitored Lear's ability to complete the chores or his finances closely, rather she just reminded him to complete them. (Tr. 384).

18

Lear has argued that the ALJ minimized the role that the case manager played in his ability to complete activities of daily living. Therefore, Lear contends that the need for constant reminders or special supervision to keep him on track would preclude him from competitive employment.

Lear also has claimed that the ALJ placed emphasis on his ability to drive and that he was employed part-time. The ALJ offered no explanation as to how Lear's ability to drive meant that he could sustain full time employment. *See* **Skubisz v. Colvin,** 2014 WL 4783851, at *9 (N.D. Ill. 2014) ("The ALJ offers no further explanation as to how Skubisz's ability to operate a motor vehicle creates a logical bridge to the conclusion that he can sustain full time employment."). The ALJ noted that Lear had worked part-time washing dishes. The ALJ indicated that while Lear may have had difficulty remembering a task, there was no evidence that he could not complete the tasks assigned to him. (Tr. 384). Lear contends that the ALJ has relied on speculation and conjecture that he was able to perform every task assigned to him.

Lear is correct, an ALJ may not substitute speculation for evidence. **White ex rel. Smith v. Apfel,** 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence."). Further, the court finds that the ability to work part-time or to sustain employment with an "indulgent employer" does not disprove that someone is not disabled. **Gentle v. Barnhart,** 430 F.3d 865, 867 (7th Cir. 2005). The ALJ is not permitted to equate Lear's part-time employment with his ability to maintain full-employment.

The court is not concluding that the ALJ over-relied on Lear's daily living, rather that the ALJ's evaluation of Lear's subjective symptoms could use elaboration. Also, because this matter is being remanded on a different issue, the ALJ should reevaluate Lear's subjective

symptoms.  On remand, the ALJ will have an opportunity to assess Lear's subjective symptoms under the standard set out in SSR 16-3p.

Lear has requested that the court remand for an award of benefits.  An award of benefits is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011).  The Seventh Circuit has held that when an ALJ's decision is not supported by substantial evidence, the appropriate remedy is to remand for further proceedings unless the evidence before the court compels an award of benefits.  *Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).  The record here does not warrant an award of benefits.  On remand, the court suggests that Lear's case be assigned to a different ALJ.  See *Travis v. Sullivan*, 985 F.2d 919, 924 (7th Cir. 1993).

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED** for further proceedings consistent with this order, and the request for an award of benefits is **DENIED.**

ENTERED this 9th day of March, 2018.

/s/ Andrew P. Rodovich
United States Magistrate Judge